[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO STRIKE
CT Page 8418
On October 6, 1994, the plaintiffs, Morrill and Laurie Barnes, Susan and William Pallato, Christopher Pallato, Mark J. and Nancy Simone, and Mark D. Simone, Joseph Simone and Daniel Simone, filed a ten count revised complaint against the defendants General Electric, United Technologies Corporation, d/b/a Pratt Whitney ("Pratt 
Whitney") and the Town of Southington.
The plaintiffs allege the following. The Barnes' are owners of a house located at 413 Old Turnpike Road in the Town of Southington, Connecticut. The Barnes' purchased the premises in 1986 and have continuously resided there since that date. Susan and William Pallato own a house located at 435 Old Turnpike Road in Southington, and lived there from 1978 through 1993. Christopher Pallato is the son of the plaintiffs Susan and William Pallato and lived with them from 1978 through 1993. Mark J. and Nancy Simone own a house in Southington at 101 ReJean Road and have lived there since 1987. Mark D., Joseph and Daniel Simone are the minor children of the plaintiffs, Mark J. and Nancy Simone, and have lived at 101 ReJean Road since 1987.
The defendant, Town of Southington, from 1920 to 1967, owned and operated a landfill known as the Old Southington Landfill ("OSL") which is located adjacent to the plaintiffs' property. During the forty-seven years that the Town of Southington operated the site, it accepted hazardous and toxic substances which continue to pose a hazard to the environment and to the health and well being of the general public and specifically the plaintiffs.
During the period of time that the OSL was in operation, the defendant, Pratt Whitney, used the OSL for the disposal of metals, solvents, PCBs, and other hazardous and toxic substances which posed and continue to pose a threat to the environment and the health and well being of the public, including the plaintiffs. Prior to 1964, open burning by the Town of Southington of the various hazardous wastes took place at the site.
In 1967, the Town of Southington, closed the OSL by compacting the loose refuse and covering the OSL with fill and seeding the site with grass. No impervious covering CT Page 8419 was used to close the OSL before it was permanently shut down. The site on which the landfill was located was later subdivided. The Town of Southington permitted the purchasers of the subdivisions to apply for, and did grant, building permits for the erection of recreational facilities, commercial, industrial and residential properties, including the residential dwellings of the plaintiffs as described above.
Prior to granting the building permits, the Town of Southington did not test the properties to ascertain whether there were hazardous or toxic materials thereon resulting from the operations of the OSL. Such testing would have predicted whether the operations of the OSL caused any contamination, harm or danger to occupants and/or users of the residences, recreational facilities, industrial buildings and commercial establishments which were to be built on the properties in question.
The plaintiffs further allege that the defendants, Pratt Whitney and General Electric were aware, or in the exercise of reasonable care should have been aware, of the uses to which the site, and properties abutting the site, were being put after the closure of the OSL. Further, Pratt Whitney and General Electric knew, or in the exercise of reasonable care should have known, that the Town of Southington had not tested the properties to ascertain whether there were hazardous or toxic materials thereon resulting from the operation of the OSL.
In a motion dated November 30, 1994, the Town of Southington moved to strike the fifth and tenth counts of the plaintiffs' amended complaint on the ground that each of those counts fails to state a claim upon which relief can be granted. Additionally, on December 5, 1994 and December 12, 1994, respectively, Pratt Whitney and General Electric each filed motions to strike the fifth, seventh and tenth counts of the plaintiffs' amended complaint on the ground that each count is insufficient as a matter of law.
A motion to strike is used to test the legal sufficiency of a complaint, counterclaim, or any count therein to state a claim upon which relief can be granted. Practice Book § 152; see Novametrix Medical Systems, Inc.CT Page 8420v. BOC Group, Inc., 224 Conn. 210, 214-15, 618 A.2d 25
(1992). A motion to strike "admits all facts well pleaded; it does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings." Mingachosv. CBS, Inc., 196 Conn. 91, 108, 491 A.2d 368 (1985). Accordingly, "if facts provable under the allegations would support a defense or a cause of action, the demurrer [motion to strike] must fail." Ferryman v. Groton,212 Conn. 138, 143, 561 A.2d 432 (1989).
In ruling on a motion to strike, the court may only consider the grounds raised in the motion. Blancato v.Feldspar Corporation, 203 Conn. 34, 44, 522 A.2d 1235
(1987). The court "must take the facts to be those alleged in the plaintiff's complaint and construe the complaint in the manner most favorable to sustaining its legal sufficiency." Warner v. Konover, 210 Conn. 150, 152,553 A.2d 1138 (1989). In deciding the motion, the facts to be considered "include the facts necessarily implied and fairly provable under the allegations . . . It does not include, however, the legal conclusions or opinions stated in the complaint. . . ." (Citations omitted). WestportBank Trust Co. v. Corcoran, Mallin Aresco, 221 Conn. 490,495, 605 A.2d 862 (1992).
I. FIFTH COUNT — STRICT LIABILITY
In the fifth count, which sounds in strict liability, the plaintiffs allege' that the defendants, General Electric, Pratt Whitney and the Town of Southington handled, burned, buried and disposed of toxic and ultrahazardous substances and materials, including chemicals and chemical products at the site. The plaintiffs further allege that these substances and materials contained latent defects and dangers to the extent that they were inherently and unreasonably hazardous and dangerous and therefore constituted a menace to human health. The plaintiffs allege that the defects in these substances were the proximate Cause of the injuries to the plaintiffs.
As to the fifth count, General Electric and the Town of Southington both adopt the memorandum of law submitted by their codefendant Pratt Whitney on December 5, 1994. The defendants argue that because the defendants' pre-1967 CT Page 8421 disposal of wastes was not an ultrahazardous activity, the fifth count fails to state a claim of strict liability. The defendants contend that "[n]o court has concluded that the Connecticut common law of strict liability applies to the landfilling of wastes or resulting subsurface contamination."
In opposition, the plaintiffs argue that the defendants' disposal of hazardous wastes does constitute an ultra-hazardous activity sufficient to state a claim for strict liability. The plaintiffs contend that the Connecticut Supreme Court has never adopted a mechanical view with respect to the application of the doctrine of strict liability. Rather, the plaintiffs note that the court looks at the "circumstances and conditions" under which an instrumentality capable of producing harm is used instead of the activity itself.
To sustain a cause of action for strict liability, a plaintiff must show that certain factors are present:
(1) an instrumentality capable of producing harm;
 (2) circumstances and conditions in its use which irrespective of a lawful purpose of due care involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; and
 (3) a causal relation between the activity and the injury for which damages are claimed.
Caporale v. C. W. Blakeslee and Sons, Inc., 149 Conn. 79,85, 175 A.2d 561 (1961); see also Arawana Mills Co. v.United Technologies Corp., 795 F. Sup. 1238, 1251 (D.Conn. 1992). Strict liability for dangerous activities "has been found applicable when an activity, not regularly engaged in by the general public, is conducted in or near a heavily populated area, such that it necessarily subjects vast numbers of persons to potentially serious injury in the event of a mishap. " Levenstein v. Yale University,40 Conn. Sup. 123, 126, 482 A.2d 724 (1984, Aaronson, J.).
Sections 519 and 520 of 3 Restatement CT Page 8422 (Second), Torts, address the doctrine of strict liability for ultrahazardous activities. Section 519 provides in pertinent part: "(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." Comment (d) of the Restatement points out, that the liability of 519 is not based on any intent of the defendant to do harm to the plaintiff; rather, it arises out of the abnormal danger of the activity itself, and the risk that it creates of harm to those in the vicinity. "It is rounded upon a policy of law that imposes upon anyone who for his own purposes creates an abnormal risk of harm to his neighbors, the responsibility of relieving against the harm when it does in fact occur." Id.
 The factors for a court to consider in determining whether an activity is abnormally dangerous are listed in 520 of the Restatement as: "(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." 3 Restatement (Second), Torts 520.
 . . . It is important to note that comment (f) of 520 clearly states that all of the factors need not be present for an activity to be considered abnormally dangerous. Comment (f) to 520 provides: "In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other handCT Page 8423 it is not necessary that each of them be present, especially if others weigh heavily." (Emphasis added.)
 . . . Comment (h) provides that "[a] combination of the factors stated in clauses (a), (b) and (c), or sometimes any of them alone, is commonly expressed by saying the activity is `ultrahazardous' or `extra-hazardous . . .'"
Green v. Ensign-Bickford Co., 25 Conn. App. 479, 485-87,595 A.2d 1383, cert. denied, 220 Conn. 919, 597 A.2d 341
(1991) citing 3 Restatement (Second) of Torts, §§ 519, 520. "The issue of whether an activity is abnormally dangerous, however, is a question of law for a court to decide."Green v. Ensign-Bickford Co., supra, 25 Conn. App. 485.
Two Superior Courts have extended strict liability for an abnormally dangerous activity to situations where gasoline discharged from storage tanks and/or pumps invaded their neighbors' land. The court in Michael v. Kenyon OilCo., Inc., 4 C.S.C.R. 337, 339 (March 22, 1989) (O'Connor, J.), stated that the underground storage of gasoline, diesel fuel and kerosine can constitute an abnormally dangerous activity so as to permit the imposition of strict liability. Similarly, in denying the defendant's motion to strike, the court in Southern New England Telephone Co. v.Clifford, Superior Court, Judicial District of Litchfield, Docket Number 05 71 31 (December 10, 1991) (Pickett, J.), held that where the plaintiff alleges that the defendant knowingly engaged in an abnormally dangerous activity, namely, the use of underground gasoline storage tanks and pumps, and has permitted the escape of ultra-hazardous substances, specifically, gasoline, the allegations were sufficient to establish a claim sounding in strict liability.
In 1983, the New Jersey Supreme Court in State,Department of Environmental Protection v. Ventron Corp.,94 N.J. 473, 468 A.2d 154, in upholding a trial court decision, concluded that the disposal of hazardous or toxic wastes, past or present, is an abnormally dangerous activity and the corporations which contributed to the pollution of a 40-acre tract were held strictly liable. The court in Ventron recognized that the disposal of toxic CT Page 8424 waste may well be an activity that is of some use to society, "[n]onetheless, the unavoidable risk of harm that is inherent in it requires that it be carried on at [Ventron's] peril, rather than at the expense of the innocent person who suffers harm as a result of it." Id., 493.
In Kenney v. Scientific, Inc., 204 N.J. Super. 228,497 A.2d 1310 (Law Div. 1985), a 1985 New Jersey Superior Court decision, the plaintiffs, who resided in the vicinity of two landfills, brought an action in strict liability, inter alia, against the owners of the landfills and a number of companies that allegedly generated the disposed of hazardous waste which led to the plaintiffs' injuries. In denying the defendants' summary judgment motion as to the count in strict liability against the companies which generated the waste, the court in Kenney noted the significance of the decision in State, Dept. of Env.Protect. v. Ventron, supra, 94 N.J. 473.
The Kenney court stated that:
 Since the potential for calamity lurking in an abnormally dangerous substance is precisely what justifies the imposition of absolute liability, the place where the substance ultimately does its marauding should not serve to dissipate such liability. A company which creates the Frankenstein monster of abnormally dangerous waste should not expect to be relieved of its accountability for the depredations of its creature merely because the company entrusts the monster's care to another . . . Furthermore, an important argument in support of strict or absolute liability is that despite the economic hardship involved, the creators of abnormally dangerous substances are far better able than the victims to sustain the costs of the injuries resulting from those substances.
Kenney v. Scientific, Inc., supra, 204 N.J. Super. 247-48. The Kenney court reinforced the notion that innocent parties should not be harmed, rather those parties who benefit, either economically or otherwise, from the abnormally dangerous activity should be held accountable. CT Page 8425Kenney v. Scientific, Inc., supra, 204 N.J. Super. 247-50.
In 1992 and 1994, the United States District Court for the District of Connecticut, however, declined to extend strict liability to situations involving abnormally dangerous activities. In Arawana Mills Co. v. UnitedTechnologies Corp., 795 F. Sup. 1238 (D.Conn. 1992), a landlord-plaintiff brought an action against the tenant-defendant who was allegedly depositing hazardous waste on the property. The District Court concluded that the tenant-defendant's metal finishing business was not a hazardous activity subject to strict liability. The court stated that "Connecticut has traditionally limited the imposition of strict liability in tort to those property owners engaged in such ultrahazardous activities as blasting and pile driving." Arawana Mills v. UTC, supra,795 F. Sup. 1251.
 "At least two other courts, including this court, have rejected the notion that the storage and use of hazardous materials, which result in a subsequent release, constitutes an abnormally dangerous activity for which strict liability should be imposed. See The Stop and Shop Companies, Inc. v. Amerata Hess Corp., H-84-454 (MJB), 11 Conn. L. Trib. No. 11, at 1 (D.Conn. Oct. 16, 1984) (Blumenfeld, J.) (where gasoline leaking from underground storage tanks had contaminated subsoil and ground water on property, no cause of action for strict liability because gasoline storage is not abnormally dangerous or ultrahazardous); William Burns, Comm'r of Transp. v. Lehigh, Inc., 1988 C.S.C.R. 722 (Conn.Super.Ct.) (July 12, 1988) ("leakage of gasoline into the subsurface soil is insufficient to state a cause of action for strict liability").
Id., 1251. In dismissing the plaintiff's strict liability count, the District Court relied on the plaintiff's failure to allege facts sufficient to meet the second prong of the requirements set forth in Caporale, supra, 149 Conn. 85. The District Court concluded that "the storage and use of hazardous waste is not per se an "ultrahazardous" or "abnormally dangerous" activity for the purpose of imposing CT Page 8426 strict liability." (Emphasis in original.) Id., 1252.
The District Court for the District of Connecticut revisited this issue in the case of Nielsen v. Sioux Tools,Inc., 870 F. Sup. 435 (D.Conn. 1994). In Nielsen, the court dismissed the plaintiff's strict liability count against the defendant whose alleged storage of hazardous waste on the plaintiff's property resulted in soil and groundwater contamination. The District Court relied heavily on the decision in Arawana Mills v. UTC, supra,795 F. Sup. 1238, in declining to extend strict liability for claims such as those of the plaintiff.
In the present case, the plaintiffs allege that hazardous and toxic substances and compounds, volatile organic compounds, PCB's, metals and pesticides from the OSL had seeped onto their properties and into adjacent wetlands and ground water, which posed and continues to pose a hazard to the health and well being of the public and the plaintiffs.
The court, in the first instance, notes that neither the Connecticut Supreme Court nor the Appellate Court has had occasion to address the issue of whether the disposal or storage of hazardous and toxic wastes at a landfill constitutes an abnormally dangerous or ultrahazardous activity sufficient to maintain a cause of action for strict liability. In the absence of binding authority on this issue, the court looks to the Federal District Court for the District of Connecticut and the Superior Courts, whose decisions provide merely persuasive authority to this court.
This court's application of both the requirements set forth in Caporale, as well as those in section 520 of the Restatement (Second) of Torts, leads it to the conclusion that the plaintiff has sufficiently alleged facts to withstand the defendants' motion to strike the plaintiffs' fifth count which sounds in strict liability.
The storage, burial and disposal of hazardous and toxic waste at a municipal landfill is capable of producing harms, including ground and surface water contamination, irrespective of whether due care is used. Additionally, the storage, burial and disposal of hazardous and toxic CT Page 8427 waste at a municipal landfill poses a risk of probable injury to such a degree that the activity fairly can be categorized as intrinsically dangerous to people or property. Furthermore, the court finds a sufficient causal relation between the defendants' storage, burial and disposal of hazardous and toxic wastes and the plaintiffs' alleged injuries.
Upon application of section 520(a) of the Restatements, the court determines that the defendants' storage, burial and disposal of hazardous and toxic wastes at a municipal landfill involved a high degree of risk of harm to property and persons and was, therefore, abnormally dangerous. The court also finds in applying section 520(b) that the "likelihood" of resulting harm from the defendants' activities to property and persons, whether it is actually minimal or severe, is "great." Additionally, the court finds under section 520(c) that the risk of "great" harm from defendants' abnormally dangerous activities cannot be eliminated by the exercise of reasonable care due to the nature of hazardous and toxic wastes and the severity of its harmful characteristics.
In following section 520(d), the court notes that while the OSL was in operation, it was common usage to dispose of commercial wastes at a landfill as it was not clearly known that disposing of these wastes was an abnormally dangerous activity. During the entire period of operation of the OSL the court is not certain that the defendants' activities were "inappropriate" under Section 520(e) in the sense that such waste had to be disposed of in some fashion. Applying guideline (f) of section 520, the court finds that despite the fact that the disposal of hazardous and toxic wastes may be an activity of some use to society, "the unavoidable risk of harm that is inherent in it requires that it be carried on at [the disposers' own] peril, rather than at the expense of the innocent person who suffers as a result of it." See Restatement (Second) of Torts, supra, § 520, comment h at 39. The court is mindful that in accordance with the words of comment f of section 520 it is not necessary that the court find each factor listed in section 520 to hold that an activity is abnormally dangerous.
Against this background, upon considering and weighing CT Page 8428 the section 520 requirements and the factors set forth by the Supreme Court in Caporale, the court finds that the plaintiffs' complaint sufficiently alleges that the defendants' actions were abnormally dangerous activities to support a claim sounding in strict liability. Accordingly, count five of the plaintiffs' complaint is sufficient as a matter of law and, therefore, the defendants' motion to strike the plaintiffs' fifth count is denied.
II. SEVENTH COUNT — INVERSE CONDEMNATION
In count seven, which sounds in inverse condemnation against defendants, the Town of Southington, General Electric and Pratt Whitney, the plaintiffs allege the following. The plaintiffs have been continually and substantially damaged by the Town of Southington's allowance of toxic and hazardous substances and materials, including chemicals and chemical vapors, which were disposed of by General Electric and Pratt Whitney. The plaintiffs have been continually and substantially damaged by the Town of Southington's allowance of such substances to spread and contaminate the area surrounding the OSL, including specifically the plaintiffs' properties. This contamination has caused the plaintiffs to be denied the use and enjoyment of their real property. This contamination has also caused the plaintiffs' respective properties to become unsalable, uninhabitable and worthless, to the extent that the properties are unable to be utilized for any reasonable and proper purpose.
Further, by reason of the State Health Report released on June 21, 1993, which declared a health emergency to exist at the site, the public-at-large became informed of the severe health dangers affecting the area, and specifically the plaintiffs' real property. As a result of this contamination, and the subsequent State Health Report, the properties have become unmarketable and unsalable, thereby substantially diminishing their value and leaving the property unable to be utilized for any reasonable and proper purpose. The Town of Southington has refused to condemn the property by eminent domain and offer just compensation. By reason of the foregoing, the real property of the plaintiffs has been markedly devalued and inversely condemned by the acts and omissions of General Electric, Pratt Whitney and the Town of Southington. CT Page 8429 December 5, 1994 and December 12, 1994, respectively, Pratt Whitney and General Electric each filed motions to strike the seventh count of the amended complaint. Defendant General Electric, in its motion, states that for the purpose of the motion to strike count seven, General Electric adopts the memorandum of law submitted by defendant Pratt Whitney. The defendants argue that because Pratt Whitney and General Electric have no sovereign power to condemn property, the seventh count, as against them, fails to state a claim for inverse condemnation. The defendants argue that a suit for inverse condemnation is a constitutional claim rounded upon the premise that a governmental body, or some other body possessing condemnation power, has physically taken the property of the claimant; or has not compensated the affected party. Finally, the defendants contend that inverse condemnation simply is not a viable cause of action against a party which does not possess the sovereign power of condemnation.
In opposition, the plaintiffs argue that the seventh count alleges an inverse condemnation of the plaintiffs' properties by reason of the acts and omissions of the defendants General Electric and Pratt Whitney, all of which where done with the consent and permission of the defendant Town of Southington. The plaintiffs further argue that while it is clear that an express delegation is necessary in order to invoke the power of condemnation, there is no reason why an express delegation is necessary in an action for inverse condemnation, where there is no actual exercise of the power of eminent domain.
"Inverse condemnation or a constitutional taking may be complete without an actual, physical appropriation of property . . . when property cannot be utilized for any reasonable and proper purpose, as where the economic utility of the property has, for all practical purposes, been destroyed. . ." (Internal quotation marks omitted.),Spicer Plus v. Groton Zoning Board of Appeals, Superior Court, Judicial District of New London at New London, Docket Number 52 11 98 (October 26, 1992) (Hurley, J.), quoting Manor Development Corp. v. Conservation Commission,180 Conn. 692, 695-96, 433 A.2d 999 (1980). "Inverse condemnation is, therefore, a cause of action against a government defendant to recover the value of property which CT Page 8430 has been taken in fact by a governmental entity although not through eminent domain procedures." McQuillan, Municipal Corporations, Vol. 11A. § 32.132.20, p. 266 (3rd ed.). Inverse condemnation of a landowner's property rights in violation of article first, 11 of the constitution occurs when "[a] landowner who, as a result ofgovernmental action, suffers a total deprivation" of the use of his property. (Emphasis added.) Luf v. Southbury,188 Conn. 336, 342, 449 A.2d 1001 (1982).
Connecticut Courts have not had the occasion to decide whether an action for inverse condemnation lies against a private party. Such claims, however, have been rejected in other jurisdictions. See Sheffet v. County of Los Angeles,3 Cal.App.3d 720, 735, 84 Cal.Rptr. 11 (1970) (Court held that the public entity, not the subdivider was liable in an inverse condemnation suit.); Pepper v. King County,810 P.2d 527 (Wash.App. 1991) (Court noted that the historic reasons for allowing an inverse condemnation claim against the government do not apply to private entities against whom a tort action may be brought.); Bach v. County ofButte, 215 Cal.App.3d 294, 263 Cal.Rptr. 565 (1989) (Court held that an inverse condemnation action requires state action and, therefore, cannot be asserted against private parties.)
Since the defendants are not governmental entities, but instead, are private companies, the defendants cannot be held liable in inverse condemnation. Therefore, the seventh count of the plaintiffs' amended complaint is legally insufficient. Accordingly, the defendants' motion to strike the seventh count as to defendants General Electric and Pratt Whitney is granted.
III. TENTH COUNT — CUTPA
In the tenth count, the plaintiffs allege that the Town of Southington's activities in offering for sale and/or selling the site constituted the conduct of a trade or commerce as defined in the provisions of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et. seq. The plaintiffs' further allege that the activities of the defendants, General Electric and Pratt Whitney, in disposing of hazardous and toxic materials and substances at the site constituted the conduct of a trade or commerce CT Page 8431 as defined in the provisions of CUTPA. The plaintiffs' allege that by failing to disclose the severity of the contamination of the site and adjoining properties even after they were aware of it, and further, after the site was placed on the NPL, the acts, omissions, misrepresentations and conduct of all of the defendants were and are unfair and deceptive acts and practices in the conduct of a trade or commerce in violation of General Statutes § 42-110b.
On November 30, 1994, December 5, 1994 and December 8, 1994, respectively, The Town of Southington, Pratt and Whitney and General Electric each filed motions to strike the tenth count of the plaintiffs' complaint. The Town of Southington and General Electric, in their motions, expressly adopt Pratt Whitney's memorandum of law in support of their motions to strike. In its memorandum in support of its motion to strike, Pratt Whitney argues as follows.
Pratt Whitney contends that because its activities in connection with the site were not part of its "trade or commerce," the tenth count fails to state a claim under CUTPA. Pratt Whitney claims that the plaintiffs have not alleged that Pratt Whitney's disposal of waste at the site was the conduct of its "trade or commerce" within the meaning of CUTPA. Pratt and Whitney contends that there is no allegation that it was, or ever had been, in the waste disposal business or that it ever advertised, sold, rented, leased, offered for sale, or distributed waste disposal services to the plaintiffs or any other party.
In opposition, the plaintiffs argue that each of the defendants were engaged in a trade or commerce in the state of Connecticut as defined by General Statutes § 42-110(4). As to the defendants Pratt Whitney and General Electric, the plaintiffs argue that they were manufacturing companies which manufactured and offered products for sale in this state. The plaintiffs further argue that the disposal of the by-products of that manufacturing process by Pratt 
Whitney and General Electric was an integral and necessary part of the trade or commerce engaged in by these defendants.
General Statutes § 42-110(b) states that "[n]o person CT Page 8432 shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a practice violates CUTPA, the courts utilize the following criteria:
 (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen].
(Citations omitted; Internal quotation marks omitted.)Jacobs v. Healey Ford-Subaru, Inc., 231 Conn. 707, 725, ___ A.2d ___ (1995); Sanghavi v. Paul Revere Life Ins. Co.,214 Conn. 303, 311-12, 572 A.2d 307 (1990). All three criteria do not need to be satisfied. A practice may be unfair because of the degree to which it meets one of the criteria or to a lessor extent it meets all three. CheshireMortgage Services, Inc. v. Montes, 223 Conn. 80, 105-06,612 A.2d 1130 (1992).
The term "trade or commerce" is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other commodity, or thing of value in this state." General Statutes § 42-110a(4).
In Mayer-Wittmann Joint Ventures, Inc. v. GuntherInternational, Ltd., 12 Conn. L. Rptr. No 16, 532 (November 14, 1994) (Lewis, J.), the court granted the defendant's motion to strike a CUTPA claim since the alleged violation did not occur in the plaintiff's normal course of trade or commerce. The defendant, Gunther, hired the plaintiff to assist it in managing and recapitalizing its corporation. The court noted that while the plaintiff seems to be in the business of providing consulting services, the defendant is not in the business of reorganizing and restructuring its corporate debt. In reaching this conclusion, the court CT Page 8433 stated that "the central issue in determining whether CUTPA should apply is whether the party against whom [the CUTPA claim] is made is in the business of entering intotransactions of the type that is at issue." (Emphasis in original) quoting Larson Skiba v. C C Package Store,
10 Conn. L. Rptr. No. 14, 441, (December 13, 1993) (Corradino, J.).
In Arawana Mills Co. v. United Technologies Corp.,
supra, 795 F. Sup. 1238, the Federal District Court for the District of Connecticut dismissed the plaintiff's CUTPA count since the alleged misconduct did not occur within the defendant's trade or commerce. The plaintiff, Arawana Mills, brought action against the defendant arising out of a lease agreement between the parties. The District Court noted that the "question before the court, therefore, is whether defendant's act of leasing the Property from the plaintiff is in the conduct of defendant's "trade or commerce" within the meaning of CUTPA." Arawana Mills Co.v. UTC, supra, 795 F. Sup. 1252.
In dismissing the plaintiff's CUTPA count, the court concluded that "defendant's act of leasing the property from the plaintiff is incidental to the conduct of its true business on the Property, the repair and servicing of aircraft engines." Id., 1253.
The District Court of Connecticut revisited this issue in the case of Brandewiede v. Emery Worldwide, United States District Court, District of Connecticut at Bridgeport, Civ. No. 5-90-504 (October 7, 1994). The court in Brandewiede noted that a claim under CUTPA is not actionable when the practice complained of is incidental to the actual trade or business of the party. The defendant, Emery Worldwide, which was engaged in the business of overnight freight delivery, claimed that it was not in the "trade or commerce" of leasing commercial aircraft for the purposes of a CUTPA claim. In discussing the CUTPA claim before the court, it stated that "[i]n this case, defendant's conduct of leasing the aircraft was incidental to its primary business of providing overnight freight service." Brandewiede v. Emery Worldwide, supra, U.S. District Court, District of Connecticut at Bridgeport.
The court finds that the defendants, General CT Page 8434 Electric's and Pratt Whitney's, activities in connection with the OSL are not within the normal "trade or commerce" of these parties within the meaning of CUTPA. The court finds that the plaintiffs' allegations of the defendants' disposal of hazardous and toxic waste chemicals at OSL are merely incidental to the primary trade or commerce of the defendants. Therefore, a CUTPA claim based on such alleged conduct is not viable against the defendants.
Accordingly, the motion to strike the tenth count of the plaintiffs' amended complaint as against defendants General Electric and Pratt Whitney is granted. Since the court finds that the action complained of does not fall within the meaning of "trade or commerce" so as to support a CUTPA claim, the other grounds for the motion to strike the plaintiffs' tenth count need not be addressed.
As against the defendant Town of Southington, the plaintiffs allege that the Town engaged in a trade or commerce by operating the Old Southington Landfill as a landfill, open to the public for the disposal of waste material. The plaintiffs further allege that the Town engaged in a trade or commerce when it decided to offer for sale to the public the property on which the site was located.
The Town of Southington argues in its memorandum of law in support of its motion to strike dated November 30, 1994 that a cause of action under CUTPA cannot lie against municipalities and, therefore, the tenth count of the plaintiffs' complaint must fail.
The plaintiffs argue in opposition that CUTPA does apply to municipalities. The plaintiffs contend that in the instant case, the activities which are the basis of the plaintiffs' CUTPA claim are not normally activities carried out by a municipality, i.e. the offer and sale of land to the public. The plaintiffs further contend that the offer and sale of land to the public is also an activity which is not regulated either by the state or federal government and an activity not normally within the purview of a municipality's responsibilities. The plaintiffs argue that there is nothing in General Statutes § 42-110a or its legislative history to indicate that municipalities engaged in activities outside their normal purview are exempt from CT Page 8435 the application of CUTPA.
In Connelly v. Housing Authority of the City of NewHaven, 213 Conn. 354, 567 A.2d 1212 (1990), the Connecticut Supreme Court held that the acts of a municipal housing authority are exempt from liability under CUTPA. The court did not, however, expressly state that municipalities are not subject to CUTPA. Id., 362. Nonetheless, many superior courts have relied upon the Supreme Court's holding in Connelly to support the conclusion that CUTPA does not apply to municipalities. See Lazaros v. City ofWest Haven, Superior Court, Judicial District of New Haven at New Haven, Docket No. 278994, (August 24, 1994) (Flanagan, J.); Lomaglio Construction v. Town of Berlin,
Superior Court, Judicial District of Hartford/New Britain at Hartford, Docket No. 52998, (March 16, 1994) (Wagner, J.); Stratford v. Siciliano, 9 Conn. L. Rptr. 506
(September 13, 1993) (Leheny, J.); Stack ContractingServices v. Stamford, 5 Conn. L. Rptr. 233 (October 28, 1991) (Murray, J.); Metcalfe v. Town of Ridgefield,1 Conn. L. Rptr. 174 (April 27, 1990) (Flynn, J.); French v.Wallingford Board of Education, 3 Conn. L. Rptr. 59
(December 20, 1990) (Berdon, J.); Chernet v. Wilton,2 Conn. L. Rptr. 475 (September 28, 1990) (Cioffi, J.).
The court initially notes that the plaintiffs have cited no authority in their brief to support their proposition that a CUTPA claim may be brought against a municipality. Against this background, this court is in accord with the numerous superior court decisions which have held that CUTPA is inapplicable to the acts of a municipality. Accordingly, the Town of Southington's motion to strike the plaintiffs' tenth count alleging a CUTPA claim is granted.
In summary, as to the plaintiffs' fifth count which sounds in strict liability, the defendants', General Electric and Pratt Whitney, motions to strike are denied. As to the plaintiffs' seventh count which sounds in inverse condemnation, defendants General Electric and Pratt Whitney's motions to strike are granted. As to the plaintiffs' tenth count alleging a CUTPA violation, the court grants the motions to strike as to each defendant, General Electric, Pratt Whitney, and the Town of Southington. CT Page 8436
M. Hennessey, J.